UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v. 25-CR-205-JLS

LAWRENCE COLBERT, et al.,

Defendants.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT LAWRENCE COLBERT'S APPEAL OF MAGISTRATE JUDGE DECISION NOT TO ISSUE RULE 17(c) SUBPOENAS**

MICHAEL DIGIACOMO
United States Attorney

BY: *s/Garrett Fitzsimmons*
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202

# TABLE OF CONTENTS


**INTRODUCTION** ........................................................................ **1**

**FACTUAL BACKGROUND** ........................................................................ **3**

A. The Proposed Subpoena to the Lancaster Police Department ........................ 5

B. The Government's Discovery Production Regarding the Lancaster Police Department. ........................ 8

C. The Proposed Subpoena to the Amherst Police Department. ........................ 9

D. The Government's Discovery Production Concerning the Amherst Police Department. ........................ 10

E. The Proposed Subpoena to the Hamburg Police Department. ........................ 11

F. The Government's Discovery Production Regarding the Hamburg Police Department. ........................ 12

G. The Proposed Subpoena to the Niagara Falls Police Department. ........................ 13

H. The Government's Discovery Production Concerning Minor Victim 2. ...... 15

I. The Proposed Subpoena to the Erie County District Attorney's Office. ...... 16

J. The Proposed Subpoena to the New York Department of Corrections and Community Supervision. ........................ 17

**STANDARD OF REVIEW** ........................................................................ **17**

**SUBSTANTIVE LEGAL FRAMEWORK** ........................................................................ **18**

A. The Discovery Framework in Federal Criminal Cases ........................ 18

B. Rule 17(c) Subpoenas and the *Nixon* Standard ........................ 20

C. *Nixon's* Relevance, Admissibility, and Specificity Standards ........................ 21

D. Rule 17(c) Subpoenas Cannot be Used to Fish for Potentially Helpful Material. ........................ 23

E. Defendants May Not Seek Material Under Rule 17 That They Are Prohibited From Obtaining Under Rule 16, Rule 17(h), Rule 26.2, and § 3500. ........... 24

F. Rule 17 Subpoenas Cannot Be Used to Obtain Impeachment Material ....... 24

G. The Defendant Must Show That the Material Sought Through the Rule 17 Subpoena is Not Otherwise Procurable. ........................ 25

**ARGUMENT** .......................................................................... **25**

A. The Defense Fails to Demonstrate that the Proposed Subpoenas Meet the *Nixon* Standard. .......................................................................... 26

1. The Lancaster Subpoena .......................................................................... 26
2. The Amherst Subpoena .......................................................................... 32
3. The Hamburg Subpoena .......................................................................... 35
4. The Erie County District Attorney's Office Subpoena .......................................................................... 38
5. The Niagara Falls Police Department Subpoena .......................................................................... 41
6. The DOCCS Subpoena .......................................................................... 44

B. The Defense's Other Objections to the Magistrate Judge's Decision Lack Merit .......................................................................... 44

1. Judge Schroeder was not required to delineate specific factual findings to determine whether to issue the subpoenas. .......................................................................... 45
2. Judge Schroeder's reference to Rule 16, Section 3500, Brady, and Giglio as "exclusive" is not reversable error. .......................................................................... 45
3. Judge Schroeder did not need to specifically address unsealing the state cases because doing so was moot. .......................................................................... 46
4. Judge Wolford's decision in Ruth does not save the proposed subpoenas .......................................................................... 46

**CONCLUSION** .......................................................................... **48**

## INTRODUCTION

The Court should not permit the defense to embark on a sweeping fishing expedition into the files of local law enforcement agencies and the Erie County District Attorney's office. The defense asks this Court to authorize 127 document requests via six subpoenas to the police departments in Lancaster, Amherst, Hamburg, Niagara Falls, the Erie Count District Attorney's office, and the NYS Department of Corrections. Many of these requests are sweeping in breadth. Further, many of these requests seek materials that are categorically prohibited from disclosure, including witness statements, grand jury materials, and prosecution memoranda. The breadth and scope of the requested subpoenas would not be permissible under liberal standard applicable to requests for production under Rule 34 of the Federal Rules of Civil Procedure, much less the highly circumscribed standard for the issuance of subpoenas under Rule 17 of the Federal Rules of Criminal Procedure.

The defense seeks to probe the records of local law enforcement in the hopes of finding material that may be useful to the defense case. Rule 17(c) does not authorize the use of criminal subpoenas to conduct such an expansive, exploratory search of third-party records. Rather, the party requesting the criminal subpoena must demonstrate "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition." *United States v. Nixon*, 418 U.S. 683, 699–700 (1974). "In other words, under the test adopted by the Supreme Court in *Nixon*, the proponent of a subpoena returnable before trial 'must clear three hurdles: (1) relevancy;

(2) admissibility; (3) specificity.'" *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 321 (S.D.N.Y. 2011) (quoting *Nixon*, 418 U.S. at 700). The defense has not cleared that threshold.

To make matters worse, the defense seeks materials which are categorically barred from production under Rule 17(c). For example, many of the subpoenas request witness statements explicitly. *See e.g.*, dkt. 109-2 at 16. Yet the very text of Rule 17 provides that "No party may subpoena a statement of a witness or of a prospective witness under this rule." Fed. Crim. Proc. Rule 17(h). The proposed subpoenas seek memoranda created by state prosecutors without an explanation as to why such material would not be privileged. Several of the requests are clearly crafted in an attempt to probe for potential impeachment material, which is also impermissible under Rule 17(c). Even further, the government has produced to the defense voluminous records it received from the very law enforcement agencies the defense seeks to subpoena.

Thus, even if the defense could meet the strict *Nixon* requirements for the issuance of the subpoenas, many of the requests in these subpoenas should be rejected based on the content sought. Ultimately, as will be demonstrated below, these requests run headlong into congressional, Supreme Court, and circuit authority: they equal parts trawl for material that is neither discoverable under the Federal Rules nor admissible at trial, to prepare for pre-trial proceedings that Rule 17(c) is not designed to assist with and seek evidence that the government has already produced in Rule 16 discovery. Accordingly, the Court should affirm Judge Schroeder's decision declining to issue these subpoenas.

## FACTUAL BACKGROUND

On March 31, 2026, a Grand Jury returned a 37-count Superseding Indictment (the "Indictment") charging Mr. Colbert with various acts of sex trafficking, child exploitation, narcotics, robbery, extortion, and firearm offenses. Dkt. 85. As relevant here, Count 11 charges Mr. Colbert and others with conspiring to sex traffic minors between May 2024 and December 2024 in violation of 18 U.S.C. § 1594(c). *Id.* at 14. The sex trafficking conspiracy encompasses, but is not limited to, Mr. Colbert's unlawful agreement to sex traffic Minor Victim 2. *See id.* at 4 ¶¶ 11–17. At the beginning of the conspiracy, Minor Victim 2 was 14 years old. Count 12 alleges that Mr. Colbert substantively sex trafficked Minor Victim 2 "[b]etween in or about May 2024 and in or about June 2024" in violation of §§ 1591(a) and 1591(b)(2). *Id.* at 15. Count 15 alleges that Mr. Colbert enticed Minor Victim 2 to engage in unlawful sexual activity between in or about May 2024 and December 2024 in violation of §2422(b). *Id.* at 17. *Before* Mr. Colbert is alleged to have sex trafficked her beginning in May 2024, Minor Victim 2 was the subject of a missing person's report filed with the Niagara Falls Police Department.

Mr. Colbert also conspired to sex traffic Minor Victim 3, who was 16 years old when the conspiracy began. *See generally id.* at 4 ¶¶ 11–17. The Indictment also alleges in Count 16 that Mr. Colbert substantively sex trafficked Minor Victim 3 in violation of 18 U.S.C. §§ 1591(a) and (b)(2). *Id.* at 17–18. Mr. Colbert's sex trafficking of Minor Victims 2 and 3, as well as the conspiracy to sex traffic minors, is closely intertwined with a robbery and extortion enterprise he headed targeting prospective commercial sex customers. *See id.* at 4–7.

Some of those customers contacted police after Mr. Colbert and others robbed, extorted, or attempted to rob and extort them. As relevant here, three state-level law

enforcement agencies encountered Mr. Colbert and his co-conspirators. First, on June 27, 2024, the Lancaster Police Department conducted a sting operation at a Red Roof Inn in Bowmansville, New York. There, an undercover Lancaster Police detective solicited Minor Victim 3 for commercial sex after seeing her in an online commercial sex advertisement. A member of the conspiracy using Minor Victim 3's phone directed the detective to the Bowmansville Red Roof Inn. The Lancaster Police Department ultimately charged one of Mr. Colbert's co-defendants in this case, Andrell Montgomery, with sex trafficking a child in violation of N.Y. Penal Law 230.34. Mr. Colbert was not charged.

Second, on July 20, 2024, Victim N.J. called 911 to report that he had just been robbed at a Motel 6 located in Hamburg, New York.[1] Officers with the Village of Hamburg Police Department responded to the scene and conducted a felony stop on Mr. Colbert's white Chevrolet Silverado. Victim N.J. then positively identified Mr. Colbert and his co-defendants, Rayquan Colbert and Kristina Eaves. Mr. Colbert was subsequently arrested for petit larceny, assault in the 3rd degree, unlawful imprisonment, robbery in the 2nd degree, menacing, and conspiracy.

Third, and lastly, on December 29, 2024, after Victim N.G. reported an extortion to 911.[2] Victim N.G. positively identified Mr. Colbert and others following a show-up that was captured on body worn camera. After the identification, Mr. Colbert and others were arrested by the Amherst Police Department. Mr. Colbert was charged with extortion, unlawful surveillance, and conspiracy. Mr. Colbert's cell phone was seized incident to his arrest and

[1] Count 20 of the Indictment alleges that Mr. Colbert and others robbed Victim N.J. of U.S. currency on July 20, 2024. Dkt. 85 at 21.

[2] Count 36 of the Indictment charges Mr. Colbert and others with extorting Victim N.G. Dkt. 85 at 31.

ultimately searched pursuant to a search warrant. Amherst Police Department detectives investigated Mr. Colbert's conduct and obtained statements from additional victims that were saved to the same file as Victim N.G.'s December 29th extortion.

### A. The Proposed Subpoena to the Lancaster Police Department

Mr. Colbert seeks the following documents from the Lancaster Police Department in connection with Case No. 24-413154, which relates to the Lancaster Police's June 27, 2024, sting operation targeting Mr. Colbert and others:

> **REQUEST NO. 1: Police Reports and Incident Reports**
>
> All police reports, incident reports, supplemental reports, and narratives related to the SUBJECT INVESTIGATION, including the Department Case Report dated June 27, 2024.
>
> **REQUEST NO. 2: Officer Reports and Notes**
>
> All reports, notes, memoranda, and documentation prepared by any officer involved in the SUBJECT INVESTIGATION, including but not limited to: - Detective Robert Cornell (Badge #39) - Officer Adam Szwartz (Badge #61) - Officer Grant Gunsher - Any other officers or detectives assigned to the case
>
> **REQUEST NO. 3: Witness/Victim Statements**
>
> All written or recorded statements obtained from the JUVENILE VICTIM or any other witnesses, including all interview notes, audio recordings, and video recordings of witness interviews.
>
> **REQUEST NO. 4: Suspect/Defendant Statements**
>
> All written or recorded statements, admissions, or confessions made by any of the SUBJECT INDIVIDUALS, including all Miranda warning forms and waiver documentation, and all interview notes, audio recordings, and video recordings of interviews.

**REQUEST NO. 5: Evidence and Property Records**

All property vouchers, evidence logs, chain of custody documentation, and documentation relating to the seizure of evidence, including specifically: - Item 001: Suspected marijuana (clear plastic baggie) - Item 002: Black Nokia cellular phone belonging to Lawrence Colbert - Item 003: Blue Motorola cellular phone - Item 004: Black cellular phone belonging to Andrell Montgomery - Item 005: White Apple iPhone belonging to Kristina Eaves (phone number [] - Item 006: Pink cellular phone - Item 007: 2018 Dodge Challenger (VIN: [] NY Plate: LHK6275) - Item 008: Ignition keys to the 2018 Dodge Challenger - Item 009: Black/pink dress - Item 010: Jean shorts - Item 011: White bra - Item 012: Winchester 12ga pump shotgun (Serial #TR124683YZSP) belonging to Andrell Montgomery - Items 013-017: Flash drives containing extracted phone data - Any other items seized during the SUBJECT INVESTIGATION

**REQUEST NO. 6: Property Return Records**

All property return documentation, including the Property Return dated June 28, 2024 regarding two New York State license plates (LHK6275) returned to Lawrence R. Colbert.

**REQUEST NO. 7: Vehicle Records**

All documentation relating to the seizure, impoundment, and/or search of the 2018 Dodge Challenger (VIN:[] NY Plate: LHK6275), including: - Impound sheets - Vehicle inventory forms - Tow records - Any items recovered from the vehicle - Any forensic examination of the vehicle - Search warrant applications (if any)

**REQUEST NO. 8: Cell Phone Extraction Records**

All documentation relating to the forensic extraction of cellular phones seized in connection with the SUBJECT INVESTIGATION, including: - Search warrant applications and affidavits for cell phone searches - All extraction reports and data - Chain of custody for phones sent to Western New York Regional Computer Forensics Laboratory - WNYRCFL Request Nos. BF- 24-0070-PREM and BF-24-0071-PREM - All flash drives or SD cards containing extracted data

**REQUEST NO. 9: Photographs and Video Recordings**

All photographs taken at the scene, during booking, or at any other time in connection with the SUBJECT INVESTIGATION. All video recordings, including but not limited to: - Body-worn camera footage from any responding officer - Any surveillance video obtained - Station house video (cell block, booking area)

**REQUEST NO. 10: Communications and Dispatch Records**

All radio communications, CAD (Computer Aided Dispatch) records, 911 call recordings, and dispatch logs related to the SUBJECT INVESTIGATION.

**REQUEST NO. 11: Prosecution Referrals**

All documents transmitted to the Erie County District Attorney's Office or any other prosecuting authority in connection with the SUBJECT INVESTIGATION, including prosecution recommendation memoranda, evidence transmittal forms, and any supplemental materials provided.

**REQUEST NO. 12: Erie County Sheriff 's Office Communications**

All correspondence, communications, and records exchanged with the Erie County Sheriff 's Office regarding the SUBJECT INVESTIGATION, including but not limited to: - Communications with Detective John Hanna - Evidence transfers - Joint investigation memoranda - Property receipts

**REQUEST NO. 13: Federal Agency Communications**

Any and all records indicating the SUBJECT INVESTIGATION was referred to or coordinated with federal law enforcement agencies, including but not limited to the U.S. Attorney's Office for the Western District of New York, the Department of Homeland Security / Homeland Security Investigations (DHS/HSI), and the Federal Bureau of Investigation (FBI). This includes emails, memoranda, telephone logs, and any other communications.

**REQUEST NO. 14: Human Trafficking Investigation Records**

All documentation relating to the investigation of the SUBJECT INVESTIGATION as a human trafficking or sex trafficking case, including: - Any Safe Harbour assessments - Any referrals

to Child Protective Services or victim services - Any trafficking indicators identified - Any communications with the National Human Trafficking Hotline

**REQUEST NO. 15: Arrest or Charging Records**

All arrest records, booking sheets, fingerprint cards, mugshot photographs, and charging documents for any person arrested or charged in connection with the SUBJECT INVESTIGATION, including specifically any records relating to the arrest or charging of Andrell L. Montgomery.

**REQUEST NO. 16: Prior Complaints or Related Investigations**

Any records of prior complaints, investigations, or calls for service involving any of the SUBJECT INDIVIDUALS or similar alleged criminal activity (human trafficking, sex trafficking, prostitution-related activity) during the period January 1, 2024 through December 31, 2024.

**REQUEST NO. 17: Shotgun Records**

All documentation relating to the Winchester 12ga pump shotgun (Serial #TR124683YZSP) turned in by Andrell Montgomery on July 5, 2024, including: - Receipt documentation - Any investigation into the firearm - Any ATF traces or NIBIN submissions - Any connection to other investigations

Dkt. 109-2 at 8–10.

**B. The Government's Discovery Production Regarding the Lancaster Police Department.**

When the government began investigating Mr. Colbert and others, it requested the entire file for Case No. 24-413154 from the Lancaster Police Department. To date, the government has produced or made available for inspection the overwhelming majority of the files it received from the Lancaster Police Department, including the following:

1. Dispatch calls;
2. Body worn camera footage;
3. Booking footage;

4. State-issued search warrants for Mr. Colbert's vehicle, the Red Roof Inn hotel room, and cell phones;
5. All cell phone extractions for the cell phones searched and seized pursuant to the state-issued warrants;
6. Commercial sex advertisements featuring Minor Victim 3; and
7. At least 111 documents of bates-stamped discovery, including the following:
    a. The Lancaster Police Department Report;
    b. Red Roof Inn records and surveillance photographs;
    c. Charging documents;
    d. Arrest records;
    e. Scene photographs;
    f. Property return receipts, including the return receipts of two New York State license plates (LHK62475) returned to Mr. Colbert;
    g. Chain of custody records;
    h. Photographs of a shotgun seized from Andrell Montgomery;
    i. RCFL laboratory receipts regarding the seized cell phones;
    j. Commercial sex advertisements;
    k. HSI Reports of Investigation regarding the transfer of seized property;[3] and
    l. Text messages between an undercover officer and Minor Victim 3 regarding the sale of commercial sex.

The government has also produced the federal search warrants for the cell phone extractions generated pursuant to the state search warrants.

### C. The Proposed Subpoena to the Amherst Police Department.

Mr. Colbert also seeks records from the Amherst Police Department concerning Case No. 24-460984, which is the file associated with the December 29, 2024, extortion of Victim N.G. This proposed subpoena mirrors the Lancaster subpoena requests with respect to request numbers 1-8 and 11 through 13. The remaining requests are as follows:

---

[3] Physical items of evidence are available for counsel's inspection. The government welcomes counsel's attempts to inspect the physical property seized in this case that he asks the Lancaster Police Department to produce.

> **REQUEST NO. 9: Show-Up / Identification Procedures**
>
> All documentation related to the show-up identification procedure conducted at approximately 04:35 hours on December 29, 2024, wherein the COMPLAINANT identified the DEFENDANTS. This includes any forms, photographs, witness statements regarding identification, and officer notes documenting the procedure.
>
> **REQUEST NO. 10: Search Warrant Materials**
>
> Any and all search warrant applications, affidavits in support, warrants issued, and returns related to the SUBJECT INVESTIGATION, including specifically any applications for search warrants for cellular telephones seized from the DEFENDANTS.
>
> **REQUEST NO. 14: Training and Policy Materials**
>
> Department policies, procedures, and training materials in effect on December 29, 2024 regarding: - Show-up identification procedures - Seizure and handling of cellular telephones as evidence - Miranda warnings and custodial interrogation

Dkt. 109-2 at 16–18.

### D. The Government's Discovery Production Concerning the Amherst Police Department.

When the government began investigating Mr. Colbert and others, it requested the entire file from the Amherst Police Department concerning Case No. 24-460984. As part of its discovery production in this case, the government has produced or made available for inspection the overwhelming majority of the files it received, including the following material:

1. The Amherst Police Department Report, which includes victim statements;
2. Body worn camera footage, to include footage that captures victim statements and depicts the show-up identification of Mr. Colbert and other defendants;
3. Booking footage;
4. 911 and dispatch recordings;

5. Video footage seized from Mr. Colbert's phone depicting the extortion of Victim N.G., the complainant in Case No. 24-460984;
6. Extractions of cell phones seized from Lawrence Colbert and Kalil Colbert;
7. A sworn statement from Victim R.A. filed under the same report number;[4]
8. Video footage of an extortion of victim R.A. seized from Lawrence Colbert's cell phone;
9. Video footage of a separate armed robbery of victim R.A. seized from Lawrence Colbert's cell phone;
10. Photo arrays conducted with victim A.H. filed under the same report number;
11. Video footage of the extortion of victim A.H. seized from Lawrence Colbert's cell phone;
12. Screenshots of text messages between victim A.H. and the telephone number 716-660-2165;
13. Photo arrays conducted with victim B.P. filed under the same report number;
14. Video footage of the extortion and subsequent attempted extortion of victim B.P. seized from Lawrence Colbert's cell phone;
15. Chain of custody documents;
16. Preservation letters; and
17. Search warrants and search warrant applications.

**E. The Proposed Subpoena to the Hamburg Police Department.**

Mr. Colbert proposes a subpoena for materials related to Hamburg Police Department Case No. 24-018736, which is the file associated with the July 20, 2024, robbery of Victim N.J. This proposed subpoena mirrors the other subpoena requests with respect to request numbers 1-10, 12, 13, and 16. The remaining four requests are:

**REQUEST NO. 11: Use of Force Reports**

All Use of Firearms/Force Reports related to the SUBJECT INVESTIGATION, including the report documenting the

[4] Victim R.A. was an additional victim identified by Mr. Colbert who has since passed away.

> felony vehicle stop at South Park & Big Tree Road and the display of a Glock 22 (Serial #MAHB657).
>
> **REQUEST NO. 14: Cell Phone Records**
>
> Any records relating to cell phones seized from the DEFENDANTS or associated with the SUBJECT INVESTIGATION, including any search warrant applications for cell phones and any extraction reports.
>
> **REQUEST NO. 15: Motel 6 Records**
>
> All records obtained from Motel 6 in connection with the SUBJECT INVESTIGATION, including: - Registration records for Room 242 - Guest information - Key card access logs - Any other business records obtained from the motel.
>
> **REQUEST NO. 17: Request for 911/Phone/Video Form**
>
> The completed "Request for 911/Phone/Video" form and all responsive audio, video, and photograph materials archived in response to that request.

Dkt. 109-2 at 24–26.

### F. The Government's Discovery Production Regarding the Hamburg Police Department.

When the government began investigating Mr. Colbert and others, it requested the entire file from the Hamburg Police Department associated with Case No. 24-018736. As part of its discovery production in this case, the government has produced the overwhelming majority of that file's contents, including the following:

1. 101 files of body camera, booking, cell block, and station footage, including body camera footage capturing victim N.G.'s statements to responding law enforcement;
2. At least 223 bates-stamped documents related to the following:
    a. Dispatch and 911 material;
    b. Victim audio recordings;
    c. Motel 6 records and surveillance footage;
    d. Scene photographs;
    e. Victim injury photographs;
    f. Body camera logs;
    g. Property logs;

h. Property receipts;
i. Chain of custody documents;
j. Hamburg Police Department Complaint;
k. Hamburg Police Department Complaint Information Report; and
l. HSI Reports of Investigation concerning the transfer of physical property.

**G. The Proposed Subpoena to the Niagara Falls Police Department.**

Mr. Colbert further proposes that the Court issue a Rule 17(c) subpoena for evidence relating to a missing person's report filed on or about April 16, 2024, with the Niagara Falls Police Department. Dkt. 109–2 at 43–49. Specifically, Mr. Colbert seeks the following records:

> **REQUEST NO. 1: Missing Person/Runaway Report**
>
> All missing person reports, runaway juvenile reports, and attempt-to-locate bulletins filed regarding the SUBJECT JUVENILE on or about April 16, 2024, including the initial report, any supplemental reports, and the case closure report.
>
> **REQUEST NO. 2: Assigned Detective Records**
>
> All reports, notes, memoranda, and documentation prepared by Detective Maio or any other detective or officer assigned to investigate the SUBJECT REPORT.
>
> **REQUEST NO. 3: Recovery/Location Records**
>
> All documentation relating to the recovery or location of the SUBJECT JUVENILE, including: - Date, time, and location where the SUBJECT JUVENILE was located - Circumstances of recovery - Names and identifying information of any persons the SUBJECT JUVENILE was with when located - Any statements made by the SUBJECT JUVENILE upon recovery - Any charges filed or persons arrested in connection with the recovery

**REQUEST NO. 4: Prior Runaway Reports**

All prior missing person or runaway reports filed regarding the SUBJECT JUVENILE, as referenced in the April 16, 2024 Facebook post stating the "Juvenile is known to run away and place herself in dangerous situations."

**REQUEST NO. 5: Dangerous Situations Documentation**

All documentation relating to the statement that the SUBJECT JUVENILE "is known to… place herself in dangerous situations," including: - Any prior incident reports - Any reports of exploitation, trafficking, or abuse - Any referrals to Child Protective Services or other agencies - Any Safe Harbour or trafficking assessments conducted

**REQUEST NO. 6: Interview Records**

All recorded or written statements obtained from: - The SUBJECT JUVENILE - The SUBJECT JUVENILE's parent(s) or guardian(s) - Any witnesses with information about the SUBJECT JUVENILE's whereabouts or circumstances

**REQUEST NO. 7: NCIC/NLETS Entries**

All documentation relating to entries into NCIC (National Crime Information Center), NLETS, or other law enforcement databases regarding the SUBJECT JUVENILE, including entry confirmations and cancellation records.

**REQUEST NO. 8: Photographs**

All photographs of the SUBJECT JUVENILE in your possession, including those used in the April 16, 2024 Facebook post and any booking or intake photographs.

**REQUEST NO. 9: Communications with Other Agencies**

All communications with other law enforcement agencies, Child Protective Services, the National Center for Missing & Exploited Children, or any other agency regarding the SUBJECT JUVENILE or the SUBJECT REPORT.

**REQUEST NO. 10: Social Media and Electronic Communications**

All records of social media posts (including the April 16, 2024 Facebook post), electronic communications, or other public notifications issued regarding the SUBJECT JUVENILE.

**REQUEST NO. 11: Associated Persons**

All documentation identifying any persons associated with the SUBJECT JUVENILE during her runaway episodes, including: - Names, aliases, dates of birth, and contact information - Any known associates, boyfriends, or adults with whom she was in contact - Any connection to Lawrence Colbert, Kalil Colbert, Kristina Eaves, Andrell Montgomery, Steven Johnson, or any other defendant or subject in U.S. v. Colbert, 25-CR-205 (WDNY)

**REQUEST NO. 12: Trafficking or Exploitation Indicators**

All documentation reflecting any investigation into or suspicion of: - Human trafficking - Sex trafficking - Sexual exploitation - Commercial sexual exploitation of a child (CSEC) - Labor trafficking - Any involvement with escort services, prostitution, or online solicitation

**REQUEST NO. 13: Related Case Numbers**

All case numbers, complaint numbers, or incident numbers associated with the SUBJECT JUVENILE during the period January 1, 2024 through December 31, 2024.

**REQUEST NO. 14: Federal Agency Communications**

Any communications with federal law enforcement agencies regarding the SUBJECT JUVENILE, including but not limited to: - FBI - Department of Homeland Security / Homeland Security Investigations (DHS/HSI) - U.S. Attorney's Office

*Id.* at 55–56.

**H. The Government's Discovery Production Concerning Minor Victim 2.**

As part of its discovery production in this case, the government has produced or made available for inspection voluminous discovery related to Minor Victim 2, including the following material:

1. The entirety of Minor Victim 2's Facebook account seized pursuant to a federal search warrant;
2. The entirety of Minor Victim 2's cell phone extraction;
3. CSAM material of Minor Victim 2 seized from Lawrence Colbert's cell phone;
4. Communications with Minor Victim 2 seized from Lawrence Colbert's cell phone;
5. Commercial sex advertisements depicting Minor Victim 2; and
6. Federal law enforcement reports and subpoenas concerning Minor Victim 2.

## I. The Proposed Subpoena to the Erie County District Attorney's Office.

Mr. Colbert also seeks to issue a subpoena to the Erie County District Attorney's Office containing 52 requests for production. These are summarized below:

1. Accusatory instruments and charging documents;
2. The complete court file;
3. "All discovery materials provided to defense counsel," including witness statements;
4. "All *Rosario* material, including prior statements of any witness the People intended to call at trial or [a] hearing . . .";
5. "All *Brady* and *Giglio* material identified or disclosed in the" cases;
6. All state Grand Jury material;
7. All intake sheets, case screening documents, prosecution memoranda, and recommendations;
8. All correspondence with defense counsel regarding plea negotiations;
9. All correspondence with the applicable police departments regarding the case;
10. All correspondence and communications with federal law enforcement agencies, including the U.S. Attorney's Office;
11. All victim communications;
12. All witness interview notes, statements, and contact information;
13. All evidence inventories and chain of custody documentation;
14. All criminal history records;
15. Documentation reflecting the current case status;
16. "All documents, memoranda, or communications reflecting any analysis or awareness that the AMHERST CASE, HAMBURG CASE, and LANCASTER CASE involved overlapping defendants or subjects (Lawrence R. Colbert and Kristina Eaves appear in all three cases) or a common scheme or plan.";
17. "All documents reflecting awareness of or investigation into similar incidents at hotels or motels in Erie County involving any of the defendants or subjects named in any of the three cases during the period January 1, 2024, through December 31, 2024.";

18. "All documents reflecting coordination between your office and any human trafficking task force, victim services organization, or specialized prosecution unit regarding any of the three cases or any of the defendants/subjects."

Dkt. 109-2 at 33–41.

### J. The Proposed Subpoena to the New York Department of Corrections and Community Supervision.

On August 16, 2016, Mr. Colbert pleaded guilty to Attempted Murder. USAO-006708 (Lawrence Colbert Criminal History). Mr. Colbert was released from the Greene Correctional Facility on April 28, 2020, and commenced community supervision, which terminated less than three full years later, on March 25, 2023. *Id.* Mr. Colbert seeks material from the New York Department of Corrections and Community Supervision ("DOCCS") relating to his time on supervision. Dkt. 109-2 at 55–56. The government is not in possession of Mr. Colbert's DOCCS file and has produced the location data related to his ankle monitor.

## STANDARD OF REVIEW

For non-dispositive rulings made by a magistrate, the District Court must review objections under the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); *United States v. Williams*, 339 F. Supp. 3d 129, 132 (W.D.N.Y. 2018)." "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Williams*, 339 F. Supp. 3d 129 at 132–33 (quoting *United States v. Feneziani*, 2007 WL 1613630, at *1 (W.D.N.Y. June 1, 2007)). "Under this highly deferential standard, magistrate judges are afforded broad discretion in resolving nondispositive disputes and reversal is appropriate only if their discretion is abused." *Williams v. Rosenblatt Sec., Inc.*, 236 F. Supp. 3d 802, 803 (S.D.N.Y. 2017) (quotation omitted).

"A court abuses its discretion when '(1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.'" *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 2018 WL 745994, at *1 (S.D.N.Y. Feb. 6, 2018) (quoting *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)). Further, even if the magistrate errs, the District Court can nonetheless affirm if the error is harmless. *See e.g., Khatabi v. Bonura*, 2017 WL 10621191, at *6 (S.D.N.Y. Apr. 21, 2017); *NIKE, Inc. v. Wu*, 349 F. Supp. 3d 346, 361 (S.D.N.Y. 2018).

## SUBSTANTIVE LEGAL FRAMEWORK

### A. The Discovery Framework in Federal Criminal Cases

Congress and the Supreme Court have implemented a strict discovery scheme that balances a defendant's interest in receiving the evidence that may be used against him at trial, and society's interests in protecting witnesses, safeguarding law enforcement operations, and promoting efficiency.

Four procedural, statutory, and constitutional cornerstones form the foundation of the government's discovery obligations. First, Federal Rule of Criminal Procedure 16 sets out a thorough and considered framework governing what the government must disclose, as well as what it may withhold. For example, Rule 16(a)(1) directs the government to disclose a defendant's oral, written, or recorded statements; his prior record; documents and objects that the government has in its possession that are material to preparing the defense, that the government intends to use in its case-in-chief at trial, or that belongs to the defendant; and reports of examinations and tests. Fed. R. Crim. P. 16(a)(1)(A)–(B), (D)–(F). By contrast,

except under certain circumstances, Rule 16(a)(2) permits the government to withhold "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). Likewise, Rule 16(a)(2) does not authorize the discovery or inspection "of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500." *Id.*

Section 3500 forms the second column of the government's discovery obligations. Section 3500(a) provides:

> [i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a).

Though the government often discloses Section 3500 material early, the law does not obligate it to do so until after its witnesses have "testified on direct examination." *Id.* § 3500(b). Even then, the government need only produce those statements which "relate[] to the subject matter as to which the witness has testified." *Id.* Third, Rule 26.2 incorporates § 3500's provisions into the Federal Rules of Criminal Procedure.

Fourth, and finally, the government must produce *Brady* and *Giglio* material, which is materially exculpatory or impeachment evidence in the government's possession, in such a time to enable the defendant to make effective use of it. *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). "While the *Brady* rule requires the [g]overnment to turn over favorable information that it knows about, it does not require the [g]overnment to seek out such information like a 'private investigator and valet . . . gathering evidence and delivering it to

opposing counsel.'" *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (quoting *United States v. Tadros,* 310 F.3d 999, 1005 (7th Cir. 2002)). Rather, a prosecutor's obligation to disclose the existence of exculpatory material is limited to that material that is in her possession or the possession of another member of the prosecution team. *See generally United States v. Meregildo*, 920 F. Supp. 2d 434, 440–42 (S.D.N.Y. 2013) (discussing what makes an agent a member of the prosecution team).

### B. Rule 17(c) Subpoenas and the *Nixon* Standard

Federal Rule of Criminal Procedure 17 governs the issuance of non-Grand Jury subpoenas in criminal cases. Fed. R. Crim. P. 17. Rule 17(c) provides that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1). "The court may direct the witness to produce the designated items in court before *trial* or before they are to be offered in *evidence*." *Id.* (emphases added).

Rule 17(c) subpoenas are limited. First and foremost, Rule 17(c) subpoenas may not be used to "subpoena a statement of a witness or of a prospective witness." Fed. R. Crim. P. 17(h). As Rule 17(h) makes clear, the production of witness statements is governed by Rule 26.2, which, as discussed *supra*, largely incorporates § 3500's terms and conditions. *See id.* Nor may Rule 17(c) subpoenas be used to conduct a "general fishing expedition" for discovery, *Nixon*, 418 U.S. at 700, and requests accurately characterized as fishing expeditions "deserve[] to be quashed" on that basis alone. *United States v. Yian*, No. 94 Cr. 719 (DLC), 1995 WL 614563, at *2 (S.D.N.Y. Oct. 19, 1995); *see United States v. Morris*, 287 F. 3d 985, 991 (10th Cir. 2002) ("Courts have held that requests for an entire file are evidence of an impermissible

fishing expedition. It appears that defense counsel attempted to use the Rule 17(c) subpoena for impermissible discovery purposes." (internal citations omitted)).

The party requesting the subpoena must demonstrate "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition." *Nixon*, 418 U.S. at 699–700. "In other words, under the test adopted by the Supreme Court in *Nixon*, the proponent of a subpoena returnable before trial 'must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity.'" *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 321 (S.D.N.Y. 2011) (quoting *Nixon*, 418 U.S. at 700).

### C. *Nixon's* Relevance, Admissibility, and Specificity Standards

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and the "fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b). For Rule 17(c) subpoenas, the lens through which their relevance is assessed is "trial-focused." *United States v. Pierre*, No. (S2) 22 CR. 19 (PGG, 2023 WL 7004460, at *16 (S.D.N.Y. Oct. 24, 2023). Though Rule 17(c) permits the production of material before trial, the ordinary meaning and structure of the rule shows that Rule 17(c) "does not contemplate the issuance of a subpoena in connection with a pretrial hearing." *Id.*; *see United States v. Jabar*, No. 9-CR-170V, 2016 WL 8671207, at *3 (W.D.N.Y. July 22, 2016) (Vilardo, J.) (quashing a Rule 17(c) subpoena where the requested "discovery might be relevant to a [pre-trial] defense of selective prosecution, but it is not relevant for the purposes

of the trial"); *accord United States v. Maxwell*, 20-CR-330 (AJN), 2021 WL 1625392, at *1 (S.D.N.Y. Apr. 27, 2021) (Nathan, J.) ("The purpose of Rule 17(c) is to facilitate the *trial* by designating a time and place prior to *trial* to obtain and inspect evidentiary material." (emphases added)).

Regarding admissibility, "Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds or would otherwise be 'inadmissible as evidence at trial.'" *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018) (quoting *United States v. Brown*, No. 95 Cr. 168 (AGS), 1995 WL 387698, at *10 (S.D.N.Y. June 30, 1995)). "Though it is difficult to analyze the admissibility of evidence where the nature of the subpoenaed materials is largely indeterminate[,]" documents and material that contain "hearsay" are not admissible. *United States v. Barnes*, No. S9 04 CR 186 (SCR), 2008 WL 9359654, at *4 (S.D.N.Y. Apr. 2, 2008).

Perhaps most importantly, to satisfy the specificity requirement, the party seeking production of the materials must 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hope [ ] that something useful will turn up.'" *Id.* (quoting *United States v. Sawinski*, No. 00 CR. 499 RPP., 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000)); *see also United States v. Constantine*, No. 21 Cr. 530 (SHS), 2023 WL 3045408, at *2 (S.D.N.Y. Apr. 21, 2023) (similar). In other words, the defendant needs to specify the information he "believes is contained in the documents or why he is entitled to it." *United States v. Shestakov*, No. 23 CR.16 (JHR), 2025 WL 507523, at *2 (S.D.N.Y. Feb. 14, 2025); *see United States v. Avenatti*, No. S1 19 Cr. 373 (PGG), 2020 WL 508682, at *5 (S.D.N.Y. Jan. 31, 2020) (holding that requested subpoena was "not sufficiently specific" because the defendant had "offered only speculation" about the contents of requested text

messages); *see generally United States v. Tokash*, 282 F.3d 962, 971 (7th Cir. 2002) (explaining that Rule 17 "allows only for the gathering of specifically identified documents *which a defendant knows to contain relevant evidence* to an admissible issue at trial" (emphasis added)).

### D. Rule 17(c) Subpoenas Cannot be Used to Fish for Potentially Helpful Material.

Twice now, the Supreme Court has made clear that Rule 17(c) "was not intended to provide a means of discovery for criminal cases." *Nixon*, 418 U.S. at 698; *see Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms. Rule 17 provided for the usual subpoena ad testificandum and duces tecum, which may be issued by the clerk, with the provision that the court may direct the materials designated in the subpoena duces tecum to be produced at a specified time and place for inspection by the defendant. Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials.").

Considering these principles, "[s]ubpoenas seeking any and all materials, without mention of specific admissible evidence, justify the inference that the defense is engaging in the type of fishing expedition prohibited by *Nixon*." *United States v. Mendinueta-Ibarro*, 956 F. Supp. 2d 511, 513 (S.D.N.Y. 2013); *United States v. Bergstein*, 788 Fed. App'x 742, 746 (2d Cir. 2019) (unpublished) (deeming subpoena overly broad because it sought "all e-mails or other communications authored or received" by two individuals "relating to almost thirty paragraphs from [the defendant's] indictment" (cleaned up)); *Maxwell*, 2021 WL 1625392, at *2 (denying subpoenas that covered communications between "any owner, shareholder, partner or employee of [the law firm subject to the subpoena] and government officials or co-

counsel in civil litigation"). Furthermore, "an impermissible discovery motive is much more likely to underlie a subpoena calling for a return well in advance of trial than one issued for return the date trial is set to begin." *United States v. Binday*, 908 F. Supp. 2d 485, 492 (S.D.N.Y. 2012).

### E. Defendants May Not Seek Material Under Rule 17 That They Are Prohibited From Obtaining Under Rule 16, Rule 17(h), Rule 26.2, and § 3500.

Just as Rule 17(c) is not designed as a discovery device, "[d]efendants may not seek material under Rule 17 that they are prohibited from obtaining under" the sources of law governing discovery in federal criminal cases. *United States v. Boyle*, No. 08 Cr. 523 (CM), 2009 WL 484436, at *2 (S.D.N.Y. Feb. 24, 2009); *see also, e.g.*, *United States v. Ceballo*, No. 03 Cr. 283 (SWK), 2003 WL 21961123, at *1 (S.D.N.Y. Aug. 18, 2003) ("'Courts must be careful that Rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16.'" (quoting *Cherry*, 876 F. Supp. at 552)).

### F. Rule 17 Subpoenas Cannot Be Used to Obtain Impeachment Material

Nor may a Rule 17(c) subpoena be used to obtain material that could be used only, if at all, to impeach a potential witness. *See, e.g.*, *United States v. Weissman*, No. 01 CR. 529 (BSJ), 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002) ("[S]everal cases articulate an absolute prohibition on the use of a Rule 17(c) subpoena solely for impeachment purposes."); *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) ("Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment.") (collecting cases); *United States v. Avenatti*, No. (S1) 19 CR. 373, 2020 WL 86768, at *5 (S.D.N.Y. Jan. 6, 2020) (same); *United States v. Nektalov*, No. 03

Cr. 828 (PKL), 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004) (noting that "documents sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena" (citing *Nixon*, 418 U.S. at 700)); *Cherry*, 876 F. Supp. at 553); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 1107526, at *2 (S.D.N.Y. Mar. 13, 2003) (quashing defendant's subpoena for personnel files regarding witnesses where materials would not have been admissible at trial and defendant failed to show that the documents were sought for anything other than impeachment); *United States v. Iozia*, 13 F.R.D. 335, 340 (S.D.N.Y. 1952) (noting that Rule 17(c) cannot be used "to require in advance of, and in preparation for, trial a disclosure to a defendant of information which may tend to impeach persons the Government may or may not call as witnesses").

### G. The Defendant Must Show That the Material Sought Through the Rule 17 Subpoena is Not Otherwise Procurable.

In addition to showing that the subpoena does not circumvent Rule 16's restrictions, the defendant must also show that the material sought through the Rule 17(c) subpoena is "not otherwise procurable in advance of trial by the exercise of due diligence." *Boyle*, 2009 WL 484436, at *2 (citing *Nixon*, 418 U.S. at 699–700). Material that is or will be produced in Rule 16 discovery or pursuant to § 3500 is "otherwise procurable." *See United States v. Cole*, No. 19 CR. 869 (ER), 2021 WL 912425, at *6 (S.D.N.Y. Mar. 10, 2021) (granting motion to quash Rule 17(c) subpoena where the government represented that it intended to produce documents responsive to the defendant's request).

## ARGUMENT

The Court should decline to issue the proposed subpoenas to law enforcement and the district attorney's office because they seek material that Mr. Colbert already possesses; is not discoverable under Rule 16, Rule 17(h), Rule 26.2, or § 3500; and because the defense fails to

satisfy *Nixon*'s strict standards of relevance, admissibility, and specificity. Moreover, the breadth and scale of the subpoenas—which seek any and all records related to the state cases, in addition to privileged attorney-work product and confidential law enforcement material—underscores that they are nothing more than an impermissible fishing expedition divorced from trial preparation.[5] To rule otherwise would impose sweeping discovery obligations in every federal criminal case that includes material from local law enforcement, with the brunt of the work of responding to the subpoenas falling on the local law enforcement agencies.

**A. The Defense Fails to Demonstrate that the Proposed Subpoenas Meet the *Nixon* Standard.**

For each of the proposed subpoenas, the defense fails to meet the standard set out in *Nixon* to justify the sweeping relief sought. Furthermore, the defense also fails to concede that the subpoenas seek categorically impermissible material. The government addresses the deficiencies of each proposed subpoena below.

*1. The Lancaster Subpoena*

The Court should decline to issue the Lancaster Subpoena for at least three reasons. First, the subpoena requests material that Mr. Colbert already possesses. *See Boyle*, 2009 WL 484436, at *2 (noting that the defendant must show that the material he seeks is "not otherwise procurable in advance of trial by the exercise of due diligence" (citing *Nixon*, 418 U.S. at 699–700)); *Cole*, 2021 WL 912425, at *6 (granting motion to quash Rule 17(c) subpoena where the government represented that it intended to produce documents responsive to the defendant's request). Regarding Request Nos. 1 through 3, Mr. Colbert seeks "[a]ll" reports" and witness

[5] Insofar as Mr. Colbert seeks DOCCS records relating to his time on community supervision, the government takes no position on that request, except insofar as it seeks communications between DOCCS and other law enforcement entities, including the U.S. Attorney's Office. Such communications are not discoverable and fail to satisfy the *Nixon* standard.

statements associated with Lancaster Police Case No. 24-413154, Dkt. 109-2 at 7, and claims that such information is "not available through any other means," Dkt. 109 at 2 ¶ 4. Similarly, in Request Nos. 5 through 9, Mr. Colbert seeks evidence and property records, photographs and video recordings, and communication records. Dkt. 109-2 at 7–8. In Request Nos. 15 and 17, Mr. Colbert requests arrest and charging records, as well as records relating to a shotgun surrendered by co-defendant Andrell Montgomery. *Id.* at 9.

Mr. Colbert already has much of this material. Regarding the reports, the government exceeded its discovery obligations by producing the Lancaster Police Department Report. *See* Fed. R. Crim. P. 16(a)(2); USAO-039016–039029. The government has likewise produced or made available for inspection the body camera footage; booking footage; dispatch calls; all cell phone extractions; commercial sex advertisements; hotel records; arrest records; photographs; property and chain-of-custody documents; laboratory receipts; and Callyo text messages that it received from the Lancaster Police Department. To the extent these materials contain Mr. Colbert's statements that the government intends to introduce at trial, they have been produced to the defense. *See* Fed. R. Crim. P. 16(a)(1)(B)(i).

Second, to the extent the subpoena seeks material Mr. Colbert does not possess, it violates the maxim that "[d]efendants may not seek material under Rule 17 that they are prohibited from obtaining under Rule 16," Rule 17(h), Rule 26.2 and § 3500. *Boyle*, 2009 WL 484436, at *2; *Bowman Dairy Co.*, 341 U.S. at 220 ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms.").

In that vein, the subpoena's request for law enforcement reports, law enforcement communications, and statements from other defendants, victims, and witnesses plainly

violates Rule 16(a)(2)'s clear statement that law enforcement reports and witness statements are not discoverable, except under circumstances not applicable here. *See* Fed. R. Crim. P. 16(a)(2); Dkt. 109-2 at 8–10 (regarding Request Nos. 1–4, 11–16). Nor are they "discoverable" under Rule 17. In fact, Rule 17(h) expressly prohibits parties from subpoenaing "a statement of a witness or of a prospective witness under this rule" and directs that "Rule 26.2 governs the production of the statement." Fed. R. Crim. P. 17(h). Rule 26.2, in turn, provides that statements need not be produced until "[a]fter a witness . . . has testified on direct examination." Fed. R. Crim. P. 26.2(a); *see United States v. Vasquez*, 258 F.R.D. 68, 73 (E.D.N.Y. 2009) ("[I]f the statements sought were made by individuals the [g]overnment intends to call as witnesses at the trial, then even if they were admissible Castro would still not be entitled to them now because Rule 17(h) expressly precludes a party from subpoenaing a witness statement."); *United States v. Yudong Zhu*, No. 13 CR. 761, 2014 WL 5366107, at *3 (S.D.N.Y. Oct. 14, 2014) (granting motion to quash Rule 17(c) subpoena seeking witness statements "by reason of Rule 17(h)'s dictate that such material is not subject to subpoena"). This Court should thus decline Mr. Colbert's invitation to turn "Rule 17(c) . . . into a broad discovery device" that "undercut[s] the strict limitation of discovery in criminal cases" developed by Congress and the Supreme Court in enacting the Federal Rules of Criminal Procedure. *Ceballo*, 2003 WL 21961123, at *1 (internal quotations omitted).

Third, the Lancaster Subpoena fails to satisfy the *Nixon* standards. Mr. Colbert makes no claim that the material he seeks from the Lancaster Police Department is relevant for trial. *Nixon*, 418 U.S. at 699–700. To the contrary, he claims that this is necessary for him to file non-dispositive and dispositive motions in this matter before a trial is even scheduled. Dkt. 109 at 4 ¶ 11. But as *Nixon*'s standards make clear, Rule 17(c) is a trial tool—not a discovery

device intended to help defendants file pretrial motions. *See Nixon*, 418 U.S. at 699–700 (requiring defendants to show that the sought-after materials "are not otherwise procurable reasonably in advance of *trial* by exercise of due diligence; [ ] that the party cannot properly prepare for *trial* without such production and inspection in advance of *trial* and that the failure to obtain such inspection may tend unreasonably to delay the *trial* due to its focus on assisting the defendant with trial, Rule 17(c)" (emphases added)). Looking to *Nixon*'s criteria, as well as the history and structure of Rule 17, other courts have concluded that Rule 17(c) "does not contemplate the issuance of a subpoena in connection with a pretrial hearing," *Pierre*, 2023 WL 7004460, at *16, and have even held that requests for Rule 17(c) subpoenas "well in advance of trial" are "much more likely" to be made in furtherance of an "impermissible discovery" objective, *Binday*, 908 F. Supp. 2d at 492. *See Jabar*, 2016 WL 8671207, at *3 (Vilardo, J.) (quashing a Rule 17(c) subpoena where the requested "discovery might be relevant to a [pre-trial] defense of selective prosecution, but it is not relevant for the purposes of the trial"); *Maxwell*, 2021 WL 1625392, at *1 (Nathan, J.) ("The purpose of Rule 17(c) is to facilitate the *trial* by designating a time and place prior to *trial* to obtain and inspect evidentiary material." (emphases added)). Here, not only are the parties "well in advance of trial," this case does not even have a trial date. *Binday*, 908 F. Supp. 2d at 492.

Moreover, insofar as the Lancaster Subpoena seeks witness statements, it solicits inadmissible hearsay. *See Nixon*, 418 U.S. at 699–700 (material must be "evidentiary" and admissible); *Shestakov*, 2025 WL 507523, at *3 ("Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds . . . ." (internal quotations omitted)). Mr. Colbert tries to circumvent this restriction by claiming that witness statements <u>might</u> be evidentiary because they could be used as "impeachment" evidence. Dkt. 109-5 at

7. But that claim runs headlong into decades' worth of precedent in which "[c]ourts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment." *Cherry*, 876 F. Supp. at 553. For this reason, as Judge Caproni recently explained in another sex trafficking case, a defendant's pre-trial effort to "cull up impeachment evidence as to each of the victims . . . . is . . . fatal" to the viability of the Rule 17(c) subpoena he seeks. *United States v. Alexander*, No. 24-CR-676 (VEC), 2026 WL 112113, at *2 (S.D.N.Y. Jan. 15, 2026).

The subpoena is also insufficiently specific. *See Rajaratnam*, 753 F. Supp. 2d at 321 (material must be sufficiently specific (citing *Nixon*, 418 U.S. at 700)). Mr. Colbert claims he has satisfied this requirement by identifying the "specific agency or office, . . . specific case number[] and incident date[], and . . . documents [he is seeking] by category." Dkt. 109-5 at 9 (citing *Kwok*, 2024 WL 1715235 at *2). Identifying virtually every category of document that conceivably could exist in a police file does not transform an overly broad subpoena into a reasonably specific one under *Nixon*. Rather, the specificity requirement demands that Mr. Colbert "reasonably specify the information contained or believed to be contained in the documents sought." *Mendinueta-Ibarro*, 956 F. Supp. 2d at 513 (quoting *United States v. Louis,* No. 04 Cr. 203, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005)). *Kwok*, the case Mr. Colbert relies upon, does not stand for a contrary position. Indeed, *Kwok* restates the very standard that Mr. Colbert flouts: "[T]o satisfy *Nixon*'s specificity requirement, 'a Rule 17(c) subpoena must be able to reasonably specify the information contained or believed to be contained in the documents sought.'" *Kwok*, 2024 WL 1715235 at *2 (quoting *Cole*, 2021 WL 912425, at *4). Beyond confirming the standard that Mr. Colbert ignored, *Kwok* did not resolve the issue

of specificity at all, and instead focused on whether the defendant could move *ex parte* for a subpoena identical to one already subject to public motion practice. *See id.* at *1, *3.

Framing the subpoena as one "likely" to return "*Brady* material" does not cure this deficiency. Dkt. 109-5 at 7. Mr. Colbert declines to set forth specific facts substantiating this belief, which strongly suggests that it is based not on evidence but the "mere[] hop[e] that something useful will turn up." *Mendinuerta-Ibarro*, 956 F. Supp. 2d at 513. Dkt. 109-5 at 7. If instead Mr. Colbert believes the Lancaster file contains exculpatory information because he already possesses it, he does not need a subpoena to receive what he already has. And even then, Mr. Colbert does not explain how, for example, a *state* law enforcement report containing a "Safe Harbour assessment[]" could exculpate Mr. Colbert in a *federal* sex trafficking case, let alone be evidentiary and admissible. Dkt. 109-2 at 9 (Request No. 14). For that matter, under what theory could Mr. Montgomery's "mugshot photographs," which were already produced, exculpate Mr. Colbert? *Id.* (Request No. 15). Because "*Brady*" is not a magical incantation that licenses a defendant to defy the federal discovery framework to fish through state law enforcement and court records, *Nixon*'s specificity requirement obligates Mr. Colbert to answer these questions when he speculates that a police file might contain exculpatory information.

And make no mistake, by repeatedly requesting "all" documents associated with the Lancaster case, the Lancaster Subpoena bears the hallmarks of the very kind of "fishing expedition" that *Nixon* prohibits. *Nixon*, 418 U.S. at 699–700; *see also Bergstein*, 788 Fed. App'x at 746 (deeming subpoena overly broad because it sought "all e-mails or other communications authored or received" by two individuals "relating to almost thirty paragraphs from [the defendant's] indictment" (cleaned up)); *Mendinueta-Ibarro*, 956 F. Supp.

2d at 513 ("Subpoenas seeking any and all materials, without mention of specific admissible evidence, justify the inference that the defense is engaging in the type of fishing expedition prohibited by *Nixon*."); *Maxwell*, 2021 WL 1625392, at *2 (denying subpoenas that covered communications between "any owner, shareholder, partner or employee of [the law firm subject to the subpoena] and government officials or co-counsel in civil litigation"). Accordingly, the Court should decline to issue the Lancaster Subpoena.

*2. The Amherst Subpoena*

The Court should decline to issue the Amherst Subpoena for the same three reasons. Like the Lancaster Subpoena, the Amherst Subpoena largely seeks material that Mr. Colbert already possesses or will possess when the District Court recommends a § 3500 production schedule. *See Cole*, 2021 WL 912425, at *6 (granting motion to quash Rule 17(c) subpoena where the government represented that it intended to produce documents responsive to the defendant's request). For example, in Request Nos. 1 and 3, Mr. Colbert requests police reports and officer notes, respectively, notwithstanding the fact that he already has police reports. To the extent he does not have a complete record of the reports and notes in the government's possession (because such reports and notes are not discoverable under Rule 16(a)(2)), he will obtain them insofar as they contain witness statements, are discoverable under Rule 26.2 and § 3500, and are in the government's possession. Regarding Request No. 5, Mr. Colbert already possesses statements by the defendants that were captured on body camera or booking footage. The government has no information to suggest that any other statements exist. The government has provided in Rule 16 discovery property records related to the seizure of Mr. Colbert's cell phone. In Request Nos. 7 and 8, Mr. Colbert requests "Photographs and Video Recordings" and "Communications and Dispatch Records." Mr.

Colbert already has discovery responsive to these requests. In Request No. 9, Mr. Colbert seeks "[a]ll documentation related to the show-up identification procedure conducted on . . . December 29, 2024." Mr. Colbert has the body camera footage capturing the lead up to, and execution of, the show-up procedure. Regarding Request No. 10, in which he seeks "Search Warrant Materials," counsel for Mr. Colbert already has the search warrant materials related to the search of Mr. Colbert's cell phone. Because the bulk of the information sought by the Amherst Subpoena is "otherwise procurable in advance of trial by the exercise of due diligence," the Court should decline to issue it. *Boyle*, 2009 WL 484436, at *2.

Second, the Amherst Subpoena "undercut[s] the strict limitation of discovery in criminal cases" by seeking material that is patently non-discoverable under Rule 16, Rule 17(h), Rule 26.2, § 3500 *Ceballo*, 2003 WL 21961123, at *1 (internal quotations omitted). Specifically, in Request Nos. 11 through 14, Mr. Colbert seeks the very kind of "Prosecution Referrals," "Federal Agency Communications," "Prior Complaints or Investigations," and "Training and Policy Materials" that Rule 16(a)(2), Rule 26.2, and § 3500 exempts from discovery. And to the extent that any of these materials contain witness statements, Rule 17(c) cannot reach them. *See* Fed. R. Crim. P. 17(h); *Yudong Zhu*, 2014 WL 5366107, at *3 (S.D.N.Y. Oct. 14, 2014) (granting motion to quash Rule 17(c) subpoena seeking witness statements "by reason of Rule 17(h)'s dictate that such material is not subject to subpoena").

Third, the Amherst Subpoena fails to clear *Nixon*'s hurdles. As before, Mr. Colbert does not claim that the material sought by the Amherst Subpoena is relevant for trial. *Nixon*, 418 U.S. at 699–700. Instead, the impetus behind the Amherst Subpoena and others is to prepare omnibus motions, Dkt. 109 at 4 ¶ 11, a matter squarely outside the ambit of Rule 17(c)'s purpose of "facilitat[ing] *the trial*." *Maxwell*, 2021 WL 1625392, at *1 (Nathan, J.)

(emphasis added); *see Pierre*, 2023 WL 7004460, at *16 (noting that Rule 17(c) "does not contemplate the issuance of a subpoena in connection with a pretrial hearing"); *Jabar*, 2016 WL 8671207, at *3 (Vilardo, J.) (quashing a Rule 17(c) subpoena where the requested "discovery might be relevant to a [pre-trial] defense of selective prosecution, but it is not relevant for the purposes of the trial"); *accord Nixon*, 418 U.S. at 699–700 (noting that the defendant must demonstrate that he "cannot properly prepare for *trial* without such production and inspection in advance of *trial* and that the failure to obtain such inspection may tend unreasonably to delay the *trial*" (emphases added)).

The Amherst Subpoena also seeks inadmissible material. For example, Mr. Colbert does not explain how "[a]ll [the] arrest records" relating to his and his co-defendants arrest from December 29, 2024, are admissible at trial, or why they would not be duplicative of witness testimony from the arresting officer or body camera footage capturing the arrests. Dkt. 109-2 at 16. And insofar as it reaches witness statements, the Amherst Subpoena solicits inadmissible hearsay. *See Nixon*, 418 U.S. at 699–700 (material must be "evidentiary" and admissible); *Shestakov*, 2025 WL 507523, at *3 ("Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds . . . ." (internal quotations omitted)). And though Mr. Colbert attempts to bypass this limitation by arguing that witness statements might contain "impeachment" evidence, Dkt. 109-5 at 7, that very argument has been widely rejected by courts in this circuit. *See Alexander*, 2026 WL 112113, at *2; *Cherry*, 876 F. Supp. at 553 ("Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment.").

Nor is the subpoena adequately specific. *See Rajaratnam*, 753 F. Supp. 2d at 321 (noting that the subpoena must be sufficiently specific (citing *Nixon*, 418 U.S. at 700)). The Amherst

Subpoena seeks every conceivable document that law enforcement could have generated in response to the December 29th extortion of Victim N.G. without "reasonably specify[ing] the information contained or believed to be contained in the documents sought." *Mendinueta-Ibarro*, 956 F. Supp. 2d at 513; *see Tokash*, 282 F.3d at 971 (explaining that Rule 17 "allows only for the gathering of specifically identified documents *which a defendant knows to contain relevant evidence* to an admissible issue at *trial*" (emphases added)). Courts, including the Second Circuit, have treated such all-encompassing requests as clear attempts to engage in improper discovery practices and have quashed (or declined to issue) the subpoenas. *See Bergstein*, 788 F. App'x at 746 (deeming subpoena overly broad because it sought "all e-mails or other communications authored or received" by two individuals "relating to almost thirty paragraphs from [the defendant's] indictment" (cleaned up)); *Morris*, 287 F.3d at 991 (observing that courts have held that requests for an entire file are evidence of an impermissible fishing expedition"). Mr. Colbert does not specify what information he believes is contained within the witness statements and reports that he seeks to obtain. Instead, it is clear based upon his request that he "hop[es]" that he will find something useful in those materials. Mere hope is not enough to satisfy *Nixon*. *See Mendinuerta-Ibarro*, 956 F. Supp. 2d at 513.

In sum, because the Amherst Subpoena seeks material Mr. Colbert already has, patently circumvents Rule 16, Rule 17(h), Rule 26.2, and § 3500, and fails each part of the *Nixon* test, the Court should decline to issue it.

*3. The Hamburg Subpoena*

The Court should decline to issue the Hamburg Subpoena for similar reasons. First, without even so much as advising the Court of his circumstances, Mr. Colbert continues to

seek material he already has. In Request No. 1, Mr. Colbert seeks "Police Reports and Incident Reports." Though such reports are non-discoverable under Rule 16(a)(2), the government has already produced the Hamburg Police Department Report. To the extent that any other report exists, contains witness statements, and is in the possession of the government, the government will produce it in accordance with the Section 3500 production schedule of the District Court. *See Cole*, 2021 WL 912425, at *6 (supporting the proposition that material that has been or will be produced by the government is "otherwise procurable"). Next, in Request No. 2, Mr. Colbert seeks "Arrest Records" related to all the defendants. The government has produced video of Mr. Colbert and his co-defendants' booking footage. To the extent Mr. Colbert seeks other materials, such as fingerprint cards, it is his burden to explain why such material is necessary to help him prepare for trial.[6]

Second, though Rule 17 does not enlarge the scope of discovery to which the defendant is entitled, *see Bowman Dairy Co.*, 341 U.S. at 220, the Hamburg Subpoena seeks information that is not discoverable under Rule 16, Rule 17(h), Rule 26.2, and Section 3500. In Request Nos. 3 and 4, Mr. Colbert seeks "Officer Reports and Notes" and "Witness/Victim Statements," including the "deposition of fact signed by the [Victim N.J.] on July 20, 2024," respectively. As before, these materials are expressly exempt from discovery under Rule 16(a)(2), Rule 17(h), Rule 26.2, and Section 3500. In seeking the very material shielded from discovery, Mr. Colbert is misappropriating Rule 17(c) to circumvent other provisions of binding law. *See Boyle*, 2009 WL 484436, at *2. Mr. Colbert already possesses the substance of Victim N.J.'s statement to the Hamburg Police Department because the government

[6] It is difficult to conceive how fingerprint cards could be material for trial short of Mr. Colbert contesting that he was, in fact, the individual arrested by the Hamburg Police Department on July 20, 2024.

produced the Hamburg Police Department Report and body camera footage in which Victim N.J. explains how he met Minor Victim 3 and ultimately was robbed by Mr. Colbert and others. In any event, under Rule 17(h), the Hamburg Subpoena cannot reach Victim N.J.'s statements. *See* Fed. R. Crim. P. 17(h); *Yudong Zhu*, 2014 WL 5366107, at *3 (granting motion to quash Rule 17(c) subpoena seeking witness statements "by reason of Rule 17(h)'s dictate that such material is not subject to subpoena"). To the extent Victim N.J. signed a written deposition, it will be produced in accordance with the District Court's recommended schedule for producing §3500 material.

Similarly, in Request No. 13, Mr. Colbert seeks "Federal Agency Communications," including communications with the U.S. Attorney's Office. These communications are not discoverable unless they contain statements of witnesses. To the extent they do, such communications will be produced in accordance with the scheduling order recommended by the District Court. Request Nos. 16 and 17 also seek law enforcement reports (including, it bears repeating, already produced reports) that are exempt from discovery under Rule 16(a)(2).

Third, the Hamburg Subpoena fails the *Nixon* test. The statements Mr. Colbert solicits also constitute inadmissible hearsay, a limitation Mr. Colbert cannot circumvent by dressing his claim in the garb of "impeachment" material. Dkt. 109-5 at 7; *Cherry*, 876 F. Supp. at 553 (noting that "[c]ourts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment"); *Alexander*, 2026 WL 112113, at *2 (similar). For that reason, the subpoena fails *Nixon*'s admissibility requirement. *See Nixon*, 418 U.S. at 700. Turning to the last of *Nixon*'s standards—specificity—the Hamburg Subpoena suffers from the same defects as the

Lancaster and Amherst Subpoenas in that it seeks "all" information related to the July 20, 2024, robbery of Victim N.J., and thus bears the telltale signs of a "fishing expedition." *See Bergstein*, 788 Fed. App'x at 746 (deeming subpoena overly broad because it sought "all e-mails or other communications authored or received" by two individuals "relating to almost thirty paragraphs from [the defendant's] indictment" (cleaned up)); *Morris*, 287 F. 3d at 991 ("Courts have held that requests for an entire file are evidence of an impermissible fishing expedition. It appears that defense counsel attempted to use the Rule 17(c) subpoena for impermissible discovery purposes." (internal citations omitted)). In a similar vein, in seeking the Hamburg Subpoena, Mr. Colbert fails to specify "the information contained or believed to be contained in the documents sought." *Mendinueta-Ibarro*, 956 F. Supp. 2d at 513.

In sum, the Court should decline to issue the Hamburg Subpoena because it seeks material Mr. Colbert already has or to which he is not entitled to receive, and otherwise fails the *Nixon* test.

4. *The Erie County District Attorney's Office Subpoena*

The Court should also decline to issue the Erie County District Attorney's Office subpoena for three reasons. First, to the extent that the subpoena seeks evidentiary material that Mr. Colbert already has, the material is "otherwise procurable." *Boyle*, 2009 WL 484436, at *2. Second, the subpoena seeks material to which Mr. Colbert is plainly not entitled to possess. *See id.* Consider first Mr. Colbert's request for "[a]ll intake sheets, case screening documents, prosecution memoranda, and recommendations" for each of the Lancaster, Amherst, and Hamburg cases. *See, e.g.,* Dkt. 109-2 at 34 (Request No. 7). This material is so clearly privileged and beyond the reach of a Rule 17(c) subpoena that government counsel cannot find a single case in which a court has ordered the production of a prosecution

memorandum. *Nixon*, 418 U.S. at 699–700; *Ceballo*, 2003 WL 21961123, at *1 ("'Courts must be careful that Rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16.'" (quoting *Cherry*, 876 F. Supp. at 552)). On this basis alone, the Court should decline to issue the Erie County District Attorney's Office Subpoena. *See Yian*, 1995 WL 614563, at *2 (noting that subpoenas properly characterized as fishing expeditions "deserve[] to be quashed").

In his appeal brief, Mr. Colbert argues that the magistrate court erred in stating that "that information that the defendant seeks from the Erie County District Attorney's Office is in substance that which has been produced by the government from the various police department files." Dkt. 139-1. He reasons that Judge Schroeder erred because the government did not collect the file of the Erie County District Attorney's office. He misses the point. It was, and is, unclear to the government what the defense believes is contained in that file that is relevant and produceable outside what has already been produced. In the subpoena, he seeks the underlying police files which were already collected and reviewed by the government. He also seeks documents he is not entitled to, such as witness statements and privileged materials. Thus, it was appropriate for the magistrate court to determine that, because the government produced volumes of information from the underlying police files, and because much of the remainder of the requests are categorically barred, that the "information that the defendant seeks from the Erie County District Attorney's Office is in substance that which has been produced by the government from the various police department files."

The subpoena also fails *Nixon* in that it seeks inadmissible, irrelevant, and vaguely defined information. For example, state-level plea negotiations are not admissible or relevant

to any issue in this case. *See* Fed. R. Evid. 410(a)(4) (prohibiting the introduction of statements "made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea"). Correspondence between the Erie County District Attorney's Office and the U.S. Attorney's Office, documents reflecting law enforcement's awareness of overlapping cases and defendants, and communications to human trafficking organizations, is not admissible or relevant to this case except insofar as it contains statements from witnesses. Such communications will be produced in accordance with Rule 26.2 and § 3500, and cannot be accessed through a Rule 17(c) subpoena. *See* Fed. R. Crim. P. 17(h); *Yudong Zhu*, 2014 WL 5366107, at *3 (granting motion to quash Rule 17(c) subpoena seeking witness statements "by reason of Rule 17(h)'s dictate that such material is not subject to subpoena"). Even if this information were somehow relevant at trial, Rule 17(c) cannot be used to help Mr. Colbert prepare pre-trial omnibus motions. *See* Dkt. 109 at 4; *Pierre*, 2023 WL 7004460, at *16; *Jabar*, 2016 WL 8671207, at *3.

Furthermore, Mr. Colbert fails to identify any concrete reason justifying his belief that the subpoena is "likely" to yield exculpatory information that he does not already possess. Dkt. 109-5 at 7. The only basis for production Mr. Colbert offers is his "mere[] hope[] . . . that something [exculpatory] will turn up" in the files. *Barnes*, 2008 WL 9359654, at *4. But as other courts have found, mere hope is too thin a reed to hang a Rule 17(c) subpoena. *See United States v. Shea*, No. 20 CR. 412-4 (AT), 2022 WL 13847351, at *2 (S.D.N.Y. Oct. 24, 2022) (granting motion to quash Rule 17(c) subpoena for state grand jury records where, in relevant part, the defendant argued "that the requested materials in the Subpoena [were] relevant because they [were] exculpatory" without identifying any "other arguments

regarding the relevance of the sought information"). Mr. Colbert offers this Court no basis to believe that "the materials actually contain exculpatory information." *Id.* at *3.

*5. The Niagara Falls Police Department Subpoena*

The Court should decline to issue the Niagara Falls Subpoena, which seeks information related to an April 2024 missing persons record concerning Minor Victim 2, for three reasons. *See* Dkt. 109-2 at 47–49.

First, insofar as all the information Mr. Colbert seeks pertains to conduct predating the May 2024 sex trafficking conspiracy and sex trafficking charged in Counts 11 and 12, respectively, the material is not "evidentiary and relevant." *Nixon*, 418 U.S. at 699–700. Though Mr. Colbert argues that whether Minor Victim 2's "movements" from April 2024 "were attributable to a trafficking conspiracy or to other circumstances" goes "to the core factual question in Counts 11 and 12," neither of those counts encompasses conduct from April 2024 concerning Minor Victim 2, let alone conduct predating April 2024.[7] Count 11 charges Mr. Colbert and co-defendant Steven Johnson with conspiring to sex traffic minors between in or about May 2024 and December 2024. Because Count 11 charges a conspiracy, the "essence" of which is "an agreement to commit an unlawful act," the government need

[7] Though Mr. Colbert focuses his argument on the April 2024 missing persons report, Request No. 4 of his subpoena seeks "[a]ll prior missing person or runaway reports filed regarding the SUBJECT JUVENILE . . ." Similarly, in Request No. 5, Mr. Colbert seeks "[a]ll documentation" relating to Minor Victim 2's history of placing herself in dangerous situations, including "referrals to Child Protective Services or other agencies . . ." Dkt. 109-2 at 47. Mr. Colbert declines to provide this Court any argument as to how this material is relevant or admissible in a sex trafficking case in which the government does not allege that Mr. Colbert used force, fraud, or coercion to compel Minor Victim 2 to perform commercial sex acts. Moreover, Rule 412 of the Federal Rules of Evidence prohibits the use of "evidence offered to prove that a victim engaged in other sexual behavior" or had a "sexual predisposition," except in circumstances not obviously applicable in this case. Fed. R. Evid. 412(a)(1)–(2).

not attribute *any* of Minor Victim 2's "movements" to the conspiracy—especially if those movements pre-date the period charged. *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (internal quotations omitted).

To be sure, Count 12 charges Mr. Colbert and Mr. Johnson with substantively sex trafficking Minor Victim 2. But still again, Minor Victim 2's missing persons report predates the charged period. Moreover, Minor Victim 2's "movements" cannot fairly be described as a "core factual issue" in the case. Count 12 demands only that the government prove that Mr. Colbert and Mr. Johnson (1) "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed]" Minor Victim 2 (2) knowing or in reckless disregard of the fact that she had not attained the age of 18 years, or had a reasonable opportunity to observe her, and (3) would be caused to engage in a commercial sex act. 18 U.S.C. § 1591. In a case where Mr. Colbert's cell phone is connected to Megapersonals.eu commercial sex advertisements of Minor Victim 2 that feature her in sexually provocative poses and contain text such as "BB [i.e., bareback] IS XXTRA," where Mr. Colbert messaged Minor Victim 2 from his Facebook account on May 26, 2024, stating "I need my nut ate again", and where, on or about December 18, 2024, Mr. Colbert sent Minor Victim 2 a text message stating, "I'm tryna nut down your throat," the core factual issues in this case do not concern Minor Victim 2's movements *prior to the charged conduct*, but whether Mr. Colbert advertised, obtained, enticed, or solicited her to engage in a commercial sex act during the relevant time periods and did so knowing or in reckless disregard of her underage status.

Second, to the extent Mr. Colbert seeks law enforcement reports and witness statements (Request Nos. 1–7, 9–14), his request impermissibly circumvents Rule 16(a)(2),

Rule 17(h), Rule 26.2, and § 3500's "strict limitation[s]." *Ceballo*, 2003 WL 21961123, at *1. Mr. Colbert cannot bypass these limitations by arguing that witness statements constitute impeachment material. *See Weissman*, 2002 WL 31875410, at *1 ("[S]everal cases articulate an absolute prohibition on the use of a Rule 17(c) subpoena solely for impeachment purposes."); *Cherry*, 876 F. Supp. at 553 ("Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment." (collecting cases)); *Nektalov*, 2004 WL 1574721, at *2 (noting that "documents sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena" (citing *Nixon*, 418 U.S. at 700)). As with his other requests, Mr. Colbert will receive witness statements in the government's possession, including law enforcement reports insofar as they contain witness statements, consistent with the District Court's recommended schedule for producing § 3500 material. For that reason, some of the files Mr. Colbert seeks are "otherwise procurable." *Nixon*, 418 U.S. at 699–700; *Cole*, 2021 WL 912425, at *6 (granting motion to quash Rule 17(c) subpoena where the government represented that it intended to produce documents responsive to the defendant's request).

Third, the Niagara Falls Subpoena, like the other subpoenas, is overly broad. Mr. Colbert is seeking almost the entire universe of material in the Niagara Falls Police Department's possession on a teenage sex trafficking victim, including material that predates his sex trafficking of her, without offering any substantive analysis whatsoever as to the admissibility and relevance of the material. Mr. Colbert does not "reasonably specify the information contained or believed to be contained in the documents sought." *Mendinueta-Ibarro*, 956 F. Supp. 2d at 513. Indeed, he does not allege any specific information about what he believes those files contain at all. Rule 17(c) demands more: Mr. Colbert must "know" that

the documents he seeks "contain relevant evidence to an admissible issue at trial." *Tokash*, 282 F.3d at 971. That is a standard he fails to meet. For these reasons, the Court should decline to issue the Niagara Falls Subpoena.

*6. The DOCCS Subpoena*

Lastly, the government takes no position on whether the Court should issue the DOCCS subpoena except it objects insofar as the subpoena seeks communications with other law enforcement agencies. *See* Dkt. 109-2 at 55–56. For the reasons stated *supra*, Rule 17(c) cannot bypass Rule 16, Rule 17(h), Rule 26.2, and § 3500. *See Ceballo*, 2003 WL 21961123, at *1 (S.D.N.Y. Aug. 18, 2003) ("Courts must be careful that Rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16." (internal quotations omitted)); *see also* Fed. R. Crim. P. 17(h) (prohibiting the subpoenaing of any witness's statement). That is precisely what the DOCCS Subpoena does insofar as it requests communications. For that reason, the Court should strike Request No. 13 from the subpoena. Finally, the government reserves its right to move to quash the subpoena after consulting with DOCCS after any such subpoena has been issued.

**B. The Defense's Other Objections to the Magistrate Judge's Decision Lack Merit**

The defense argues that Judge Schroeder's decision is defective because the court (1) did not make "*Nixon* findings," (2) referred to Rule 16 as the "exclusive discovery tool", (3) did not make specific findings with respect to unsealing the state cases, and (4) did not address the *Ruth* decision. None of these objections make the subpoenas any more worthy of issuance.

1. *Judge Schroeder was not required to delineate specific factual findings to determine whether to issue the subpoenas.*

The defense argues that Judge Schroeder failed to make "*Nixon* findings" when the court decided the motion on the subpoenas. *See* Dkt. 139-1 at 9. Although courts of course analyze the factual circumstances when determining whether a proposed subpoena is proper, there is no requirement that the court make specific factual findings or hold an evidentiary hearing. The government has not located any case that uses the phrase, "*Nixon* findings." The court reviewed the parties' lengthy briefing, heard oral argument, and decided that the 127 proposed document requests did not pass muster. The court must provide reasons for its decision, but need not issue formal factual findings to determine the appropriate scope of subpoenas. The court provided its reasoning here. After describing the nature of the sought materials and the government's productions, the court concluded that the defense was attempting to use "Rule 17(c)(3) as a superseding tool for discovery in this criminal case." Dkt. 133. That conclusion is sound. Putting the breadth of the subpoenas aside, the attempt to obtain witness statements is a clear attempt to work around the limitations of Rule 16 and Section 3500.

2. *Judge Schroeder's reference to Rule 16, Section 3500, Brady, and Giglio as "exclusive" is not reversable error.*

The defense makes much of Judge Schroeder's statement that "Rule 16(a) of the Federal Rules of Criminal Procedure is the exclusive discovery tool available to a defendant in a criminal case along with the Jencks statute (18 U.S.C. § 3500) and the *Brady*, *Giglio* principles." Dkt. 133 at 4. The thrust of the defense's argument is that Judge Schroeder effectively interpreted Rule 17 to be a nullity because Rule 17 subpoenas are the only avenue to compel documents from third parties in a federal criminal proceeding. This interpretation

misunderstands the definition of a "discovery tool" in this context. Federal courts interpret Rule 17 so narrowly that they do not even consider it a discovery tool. *United States v. Chirico*, No. 1:25-CR-00365 (JLR), 2026 WL 1760129, at *5 (S.D.N.Y. June 18, 2026) (stating that "Rule 17(c) is not a discovery device" in the context of third-party subpoenas); *United States v. Maxwell*, 2021 WL 1625392, at *2 (S.D.N.Y. Apr. 27, 2021) ("Rule 17(c) subpoenas are not tools of discovery.").

Judge Schroeder did not conclude that Rule 17 subpoenas could never issue under any set of circumstances. He simply mirrored the language used by other federal courts when describing the limited nature of Rule 17. This interpretation is reenforced by the preceding sentence suggesting that the defense was attempting to use Rule 17 as a "superseding" discovery tool.

3. *Judge Schroeder did not need to specifically address unsealing the state cases because doing so was moot.*

The defense objects that Judge Schroeder did not specifically address the motion to unseal the state cases. Unsealing the state cases would only be necessary if the court authorized the subpoenas requesting the sealed materials. Because the court declined to issue the subpoenas, there was no need to unseal the state cases.

4. *Judge Wolford's decision in Ruth does not save the proposed subpoenas*

The defense argues that Judge Schroeder did not adequately consider Judge Wolford's decision in *United States v. Ruth*, in which the Court authorized the issuance of a Rule 17 subpoena to the Cattaraugus County District Attorney's Office. 495 F. Supp. 3d 161, 163 (W.D.N.Y. 2020). However, the court in *Ruth* made clear that it was issuing the subpoena only because the case was in a post-trial posture, stating that "the relevancy and admissibility of the information sought by Ruth must be viewed in the context of the type of proceeding at

hand. In other words, while the evidence sought by Ruth may not meet the standard for admissibility at trial, he is seeking to use this evidence in connection with his sentencing hearing, where the Court can receive a wide range of information in its effort to impose a fair and just sentence." *Id.* at 164. In addition, the proposed subpoena in *Ruth* contained a single request, not 52 sweeping document requests as Mr. Colbert seeks from the Erie County District Attorney's Office. *Id.* at 163.

The court in *Ruth* also described a highly fact-specific scenario involving (1) the credibility of a deceased witness who perished prior to the sentencing hearing but whose pre-recorded video testimony was introduced, (2) the obvious unavailability of a deceased witness, (3) the failure of the Cattaraugus County District Attorney's Office to respond to a subpoena, and (4) certain failures in the government's production at the sentencing hearing. Those circumstances are not present here and *Ruth* does not stand for a sweeping proposition that local prosecutor's offices may be subject to a Rule 17 subpoena in every state case adopted by the federal government.

Even if *Ruth* were not distinguishable, it was wrongly decided. The court in *Ruth* did not provide a robust analysis of the *Nixon* factors and stated that the materials were relevant in part because they might contain impeachment material, which is contrary to established, albeit non-binding, precedent. *United States v. Weissman*, 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002); *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995); *United States v. Avenatti*, 2020 WL 86768, at *5 (S.D.N.Y. Jan. 6, 2020); *United States v. Nektalov*, 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 1107526, at *2 (S.D.N.Y. Mar. 13, 2003); *United States v. Iozia*, 13 F.R.D. 335, 340 (S.D.N.Y. 1952).

Ultimately, even if the Court is persuaded by the reasoning in *Ruth*, it does not justify the sweeping subpoena sought by the defense here. It was not binding on Judge Schroeder, it is not binding on this Court, and it should not be interpreted to permit the relief sought by Mr. Colbert.

## CONCLUSION

For the reasons stated herein, the government respectfully asks that the Court deny Mr. Colbert's Objections to the Magistrate Judge's Decision denying the issuance of Rule 17(c) Subpoenas without prejudice.

DATED: Buffalo, New York, October 23, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY: *s/Garrett Fitzsimmons*
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202